IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF TEXAS
DALLAS DIVISION

| | | |
|---|---|---|
| KARON DAVIDSON, | § | |
| | § | |
| **Plaintiff,** | § | |
| | § | |
| v. | § | Civil Action No.  3:14-CV-2377-M (BH) |
| | § | |
| CAROLYN COLVIN, ACTING, | § | |
| COMMISSIONER OF THE SOCIAL | § | |
| SECURITY ADMINISTRATION, | § | |
| | § | |
| **Defendant.** | § | |

## MEMORANDUM OPINION AND ORDER

Pursuant to the consent of the parties and the order of reassignment dated September 2, 2014 (doc. 15), this case has been transferred for the conduct of all further proceedings and the entry of judgment. Based on the relevant filings, evidence, and applicable law, the Commissioner's decision is **REVERSED**, and the case is **REMANDED** for reconsideration.

## I.   BACKGROUND

### A.   <u>Procedural History</u>

Karen Davidson (Plaintiff) seeks judicial review of a final decision by the Commissioner of Social Security (Commissioner) denying her claim for disability insurance benefits (DBI) under Title II of the Social Security Act.[2]   On November 28, 2011, Plaintiff applied for DBI, alleging disability beginning on August 19, 2011, due to status post lung cancer, cirrhosis of the liver, hearing problems, immune problems, and cancer. (R. at 72, 130, 145, 159.)  Her application was denied initially and upon reconsideration. (R. at 74, 84.) Plaintiff requested a hearing before an

---

[2]   The background information is summarized from the record of the administrative proceedings, which is designated as "R."

Administrative Law Judge (ALJ), and she personally appeared and testified at a hearing held on January 24, 2013. (R. at 87, 32-71.)  On August 30, 2013, the ALJ issued his decision finding Plaintiff not disabled.  (R. at 9-27.)  She requested review of the ALJ's decision, and the Appeals Council denied her request on May 5, 2014, making the ALJ's decision the final decision of the Commissioner.  (R. at 1, 8.)  Plaintiff timely appealed the Commissioner's decision pursuant to 42 U.S.C. § 405(g).  (*See* doc. 1.)

B.      **Factual History**

1.      **Age, Education, and Work Experience**

Plaintiff was born on December 12, 1957, and was 55 years old at the time of the hearing before the ALJ.  (R. at 35,130, 145.) She had a ninth grade education and past relevant work as a cashier/sales clerk for a thrift store, a cashier for a grocery store, and a fast food worker.  (R. at 36, 62, 63.)

2.      **Medical, Psychological, and Psychiatric Evidence**[3]

From August 27, 2008 until July 14, 2010, Plaintiff saw Andrew D. Merkin, M.D., as her primary care physician, for treatment of hepatitis C, cirrhosis, vertigo, migraines, eustachian tube dysfunction, sinus infection, abdominal pain, and bronchitis.  (R. at 234-256.)  She also presented to Dallas Regional Medical Center (Dallas Regional) periodically during this time frame.  On July 5, 2008, Plaintiff went to Dallas Regional complaining of dizziness.  (R. at 382.)  It was noted that she might have taken too many medications.  (R. at 384.)

Plaintiff returned to Dallas Regional on October 17, 2008, because she "just [didn't] feel

---

[3]Because only Plaintiff's physical impairments are at issue, a full recitation of the psychological and psychiatric evidence is unnecessary.  Psychological and psychiatric evidence is noted when it includes information relevant to the physical impairments at issue, however.

right."  (R. at 380.)  Hepatitis C and liver cirrhosis were listed as her past history, and she was diagnosed with fatigue and hepatitis C. (R. at 379, 380.)

On January 8, 2009, Dr. Merkin completed a medical certification form for Plaintiff, in which he indicated that she had chronic conditions of hepatitis C and eustachian tube dysfunction. (R. at 268-69.)  He opined that she would be unable to perform work of any kind during her "spells" or intermittent flares, and that her condition or incapacity would last about a year.  (R. at 269.)

On February 2, 2009, Plaintiff was diagnosed with weakness.  (R. at 377.)  On February 16, 2009, she suffered from a mild head injury.  (R. at 373.)

On February 22, 2009, Plaintiff presented to Dallas Regional complaining of dizziness.  (R. at 351.)  Imaging revealed that her scalp, skull, and sinuses were normal.  (R. at 352.)

On March 9, 2009, she complained of pain in multiple sites and was diagnosed with muscle strain.  (R. at 368.)

On May 7, 2009, Plaintiff complained of generalized abdominal pain, but no dilated bowel loops were noted on an x-ray.  (R. at 350.)

On May 26, 2009, Plaintiff presented to Dallas Regional with flu symptoms, and her discharge diagnosis was bronchitis and an upper respiratory infection.  (R. at 363.)

Dr. Merkin completed a certification form for the Family Medical Leave Act (FMLA) on October 14, 2009, noting that Plaintiff suffered from a tooth abscess, "dry socket", and pain that would incapacitate her from October 14, 2009 until October 18, 2009.  (R. at 272.)

Plaintiff returned to Dallas Regional with a toothache and jaw pain on October 18, 2009.  (R. at 356, 359.)  On January 19, 2010, she again presented to Dallas Regional with a toothache. (R. at 353.)

On March 5, 2010, Plaintiff was admitted to Dallas Regional due to generalized abdominal pain.  (R. at 345.)  An x-ray of her abdomen was unremarkable.  (R. at 346.)

On March 8, 2010, Plaintiff complained of flank pain and was diagnosed with dysuria, or difficulty urinating, at Dallas Regional.  (R. at 344.)

On March 13, 2010, Plaintiff was diagnosed with an ovarian cyst.  (R. at 333.)

Dr. Merkin completed another FMLA certification form on March 25, 2010, in which he noted that Plaintiff had a condition associated with hepatitis C with symptoms of vertigo, abdominal pain, and flank pain.  (R. at 278.)  It had begun approximately March 15, 2010, and had an unknown duration.  (R. at 278.)  He opined that the condition caused episodic flare-ups periodically that prevented Plaintiff from performing her job functions, and that she would require treatment for about four to five days.  (R. at 279.)[4]  He also opined that her flare-ups would occur approximately once every two months and last for five days per episode.  (*Id.*)

Dr. Merkin completed an FMLA certification form on April 7, 2010, in which he noted that Plaintiff had a condition associated with vertigo that had begun approximately on March 29, 2010, and would probably continue until December 31, 2010.  (R. at 277.)  He noted that the condition caused episodic flare-ups periodically that prevented Plaintiff from performing her job functions, and that she was unable to work due to her illness. (R. at 277.)  According to Dr. Merkin, Plaintiff would experience flare-ups one to two times for the next one to three months that would last two to three days.  (*Id.*)  He reported that she had several inter-related problems that caused absences from work. (*Id.*)

On May 17, 2010, she presented to Dallas Regional with flank pain due to an ovarian cyst.

---

[4]Plaintiff was a cashier at Walmart.  (R. at 40-41, 279.)

4

(R. at 326-27.)

On June 24, 2010, Dr. Merkin wrote a letter on Plaintiff's behalf stating that as far as he could tell, she was "mentally and physically [in]capable[5] of full time employment." (R. at 280.) He stated that she would need close and frequent treatment by a physician as a result of her hepatitis C. (*Id*.) He found her condition to be difficult to predict, which led to her anxiety. (*Id*.)

On September 17, 2010, she presented to Parkland Health & Hospital Systems (Parkland) due to urolithiasis. (R. at 438.) A CT scan revealed right ovarian cysts. (*Id*.) She returned for a pap smear and a human papillomavirus (HPV) test on October 26, 2010. (R. at 446.)

Plaintiff presented to Parkland's orthopedic clinic with complaints of a bunion on her right foot on December 3, 2010. (R. at 450.) At the time, she had no pain and felt that her foot was getting better. (*Id*.) She was assessed with hallux valgus. (*Id*.) She only wanted conservative treatment and no surgery, so it was recommended that she use shoes with a wide toe box. (*Id*.)

On December 6, 2010, she returned to the clinic with complaints of pain in her left thumb. (R. at 452.) She was assessed with arthritis in her left carpometacarpal joint, and she was given a joint injection and asked to rest for a few days. (R. at 451-52.) It was recommended that she take anti-inflammatories and go to therapy. (R. at 453.)

On January 24, 2011, Plaintiff was admitted to Dallas Regional as a result of a toothache and left jaw pain. (R. at 322-23.) She was diagnosed with dental caries and acute dental pain, and she was prescribed medication. (R. at 324.)

On August 12, 2011, she underwent a Psychiatric Diagnostic Interview Exam with Kazia Luszczynska, M.D., at Metrocare Services (Metrocare). (R. at 557.) Dr. Luszczynska noted that

---

[5]Dr. Merkin actually wrote "capable." (R. at 280.) The Commissioner does not raise an issue with Plaintiff's assumption in her brief that Dr. Merkin meant to write "incapable."

Plaintiff had not worked since last April despite her efforts.  (R. at 559.)  She listed Plaintiff's barriers as anxiety, unemployment, and medical illness.  (*Id.*)

That same day, Plaintiff also saw Monica Loeza at Metrocare for assistance with choosing or obtaining employment.  (R. at 561.)  Her objective was to get a job and learn about and access community resources.  (*Id.*)  She reported stress as a result of her inability to find employment.  (R. at 562.)  Ms. Loeza listed her barriers as being unemployed, having trouble hearing in her right ear, and lacking a support group.  (*Id.*)  Plaintiff was able to identify the type of employment category she most likely enjoyed, and she anticipated eventually finding employment.  (*Id.*)

On August 20, 2011, Plaintiff was admitted to Lake Pointe Medical Center (Lake Pointe) due to swelling on the left side of her neck that had been increasing in size, as well as a sensation that she was choking.  (R. at 409.)  Her past medical history was significant for hepatitis C, cirrhosis, and anxiety disorder.  (*Id.*)  A sample taken from her neck for evaluation did not reveal any malignant epithelioid cells.  (R. at 402.)  She was discharged from Lake Pointe on August 22, 2011.  (R. at 413.)  Plaintiff presented to Parkland on August 25, 2011, to follow up regarding a throat infection, and lung mass.  (R. at 456.)  An x-ray revealed a suspicious legion on the right upper lobe of her lung. (R. at 460.)

On September 12, 2011, as part of her session regarding assistance with choosing, getting, and keeping housing, Dung Nguyen at Metrocare "linked" her to the Social Security Administration (SSA) so she could apply for supplemental security income.  (R. at 571.)

On September 13, 2011, Plaintiff received a CT scan of the chest and neck.  (R. at 469-474.) The CT scan revealed that the left cervical lymphadenopathy had decreased significantly, but her right upper lobe pulmonary module was roughly unchanged in size. (R. at 479.)

6

She returned to Parkland for a follow-up on September 20, 2011.  (R. at 476.)  She reported feeling anxious over the past month due to the masses in her lung and neck, but the lump on her neck had gone down significantly and no longer hurt.  (R. at 477.)  When given the choice to biopsy the right upper lobe lesion or follow up with a serial CT scan, Plaintiff chose a biopsy.  (R. at 479.)   It was noted that there was a suspicion of cancer, although prior infection was possible.  (*Id*.)

On September 27, 2011, Plaintiff returned to Metrocare for psychosocial rehabilitation.  (R. at 572.)   She reported to her clinician, Stephanie Urban, that she intended to improve her functionality and overall stability, as well as develop skills in order to find and maintain a job or other income.  (R. at 573.)  Ms. Urban noted that Plaintiff would be medication and appointment compliant and would start the SSA application process.  (*Id*.)

On September 28, 2011, Plaintiff underwent a biopsy of a portion of the right upper lobe of her lung at Parkland.  (R. at 488.)  She returned on October 4, 2011, and was diagnosed with lung cancer.  (R. at 503, 507.)  Dr. Chiu noted that her right upper lobe nodule was adenocarcinoma of the lung, and that he would obtain a pulmonary function test and refer her to the Department of Cardiovascular and Thoracic Surgery  for resection.  (R. at 507.)

On October 6, 2011, Plaintiff presented to Metrocare for another psychosocial rehabilitation session with Ms. Urban.  (R. at 575.)  Ms. Urban noted that Plaintiff was working toward improving her overall health and life stability in order to improve her position for seeking employment or other ongoing financial assistance.  (*Id*.)  Plaintiff had another session on October 17, 2011.  (R. at 579.)  Ms. Urban noted that Plaintiff decided to forgo her job search at that time in favor of applying for social security disability and concentrating on personal health.  (*Id*.)

On October 28, 2011, Plaintiff presented to the oncology department at Parkland.  (R. at

514.)  She reported that she missed a prior appointment scheduled on October 14, 2011, due to a seizure; she'd had a seizure disorder since she was seven years old but was never treated for it.  (*Id*.)

Plaintiff  again presented to Metrocare on November 1, 2011 for a session with Ms. Urban. (R. at 580.)  She reported an improvement in her general mood after she learned that her cancer was localized and had not spread.  (R. at 581.)  Ms. Urban reported that Plaintiff would continue to work on developing skills to manage her symptoms in order to improve her employability and seek to overcome barriers to employment.  (*Id*.)

Plaintiff saw Dr. Wait at Parkland on November 4, 2011, for surgical consideration of lung cancer of the right upper lobe of her lung.  (R. at 521.)  Dr. Wait's impression was that she had a stage 1A lesion on her lung that was likely resectable and operable.  (*Id*.)  He scheduled her for a right thoracotomy, a RULlobectomy, and a mediastinal LN dissection.  (R. at 521-22.)

On November 7, 2011, Plaintiff presented to the Southeast Dallas Health Center, a Parkland clinic, due to hypertension.  (R. at 546.)  She reported that she had no chest pain, chest pressure, or palpitations.  (R. at 549.)  She was positive for malaise/fatigue, congestion, shortness of breath, palpitations, nausea, and weakness, and she was assessed with hypertension, tooth pain, and hepatitis C.  (R. at 551-52.)

Plaintiff underwent a thoracotomy, RULlobectomy, and mediastinal LN dissection on November 21, 2011.  (R. at 523.)

On December 6, 2011, Plaintiff presented to the Lung Diagnostic Clinic at Parkland for evaluation of an abnormal CT scan from an outside medical facility.  (R. at 462.)  The attending physician noted that Plaintiff had a productive cough.  (R. at 464.)  He strongly suspected a case of tuberculosis (TB) cervical lymphadenitis, and he ordered a t-spot TB test and a CT chest x-ray.  (R.

at 464-65.)

On December 9, 2011, Plaintiff presented to Parkland because she was not feeling well due to a sinus infection. (R. at 659.) She reported she sometimes felt short of breath but was breathing fine for the most part. (*Id.*) The thoracostomy site was well-healed, and the thoracostomy tube sites were almost completely healed. (*Id.*) It was noted that there was nothing to suggest a benefit from "short term or intermediate term recurrence" or a need for chemotherapy. (R. at 662.)

Plaintiff returned to Parkland due to constant pain at her surgical site as well as constant nausea and vomiting on December 19, 2011. (R. at 624, 627.) The nurse reported that she had redness, tenderness, and mild edema to the surgical site, although it did not appear infected. (R. at 625, 627.) Plaintiff had been seen at another facility the previous Thursday for bronchitis and was prescribed Bactrim due to concern that her wounds were infected. (R. at 625, 627.) She reported her pain was made worse by coughing. (R. at 625.) She was positive for chills, cough, nausea, and vomiting. (R. at 626.) An ultrasound revealed that the liver was normal in size and the hepatic parenchyma was sonographically unremarkable. (R. at 879.) There was no intrahepatic biliary dilatation or focal hepatic mass. (*Id.*)

On January 12, 2012, Plaintiff presented to Parkland's Southeast clinic for dental pain. (R. at 681.) She appeared well-developed, well-nourished, and under no distress. (R. at 685.) She underwent a special screening for malignant neoplasms, and she was given an oral rinse and ibuprofen. (*Id.*)

Plaintiff presented to Metrocare on January 16, 2012. (R. at 790.) She reported an increase in anxiety and depression since her lung cancer surgery. (*Id.*) She also reported that she was hard of hearing and failed at several interviews, which increased her anxiety because her unemployment

was running out.  (*Id.*)

On February 2, 2012, Dr. Manda Waldrep, a state agency medical consultant (SAMC), completed a Case Assessment.  (R. at 677.)  She found that Plaintiff had a medically determinable impairment of status post lung cancer that was non-severe.  (*Id.*)  She noted that Plaintiff alleged that she had cancer, cirrhosis, hepatitis C, and immune problems.  (*Id.*)  The evidence of record showed that Plaintiff was diagnosed with hepatitis C, but there was no sequela of chronic liver disease. (*Id.*)  She additionally noted that Plaintiff had a RUL lobectomy, that her thoracotomey was well-healed, and that she would not benefit from chemotherapy as reported by the physician. (*Id.*)  Dr. Waldrep specifically noted records from September 28, 2011 until December 9, 2011.  (*Id.*)  She found that while Plaintiff's current allegations and symptoms were severe, they were not expected to last for twelve months; after twelve months, she was expected to function as indicated in her assessment.  (R. at 678.)

Plaintiff presented to the "Ortho Foot" department on February 3, 2012, complaining of foot pain.  (R. at 745.)  She had pain in her bilateral bunion with the left second toe crossing over hallux.  (R. at 748.)  She reported that she had short-term improvement with wider toe box shoes.  Since she was off work, she wanted to have bilateral bunionectomies so she could return to work as a cashier once she recovered from the lobectomy.  (*Id.*)  She was diagnosed with bilateral hallux valgus and was told she must obtain medical clearance before a osteotomy of the bilateral hallux valgus would be performed.  (R. at 749.)

She returned to the clinic on February 6, 2012, for a physical examination and a pap smear, and because she was experiencing a "pus pocket at the top right side of her mouth."  (R. at 711.)  Physical examination revealed right upper gum atrophy.  (R. at 718.)  She was told to schedule an

10

appointment with a dentist.  (R. at 732.)

On March 18, 2012, Plaintiff presented to Parkland for a pre-operation examination for her bunion surgery.  (R. at 1072.)  A referral to the liver clinic was approved.  (*Id*.)  She was assessed with foot pain, chronic obstructive pulmonary disease (COPD), and hepatitis C.  (R. at 1075.)

On April 12, 2012, Plaintiff returned to Metrocare for a routine follow-up.  (R. at 798.)  She reported that Klonopin was effective for relieving anxiety, and she would be returning to the liver clinic for chemotherapy.  (R. at 799.)  Her clinician noted that she was experiencing fatigue.  (*Id.*)

On April 24, 2012, Plaintiff underwent a psychological evaluation by Gerald Stephenson.  (R. at 858-863.)  Plaintiff reported that her unemployment benefits had run out.  (R. at 859.)

On May 7, 2012, Dr. Shabnam Rehman, a SAMC, completed a Case Assessment for reconsideration of the February 2, 2012 assessment.  (R. at 838.)  She found that the medical evidence of record supported the nonsevere finding in the February 2012 assessment.  (*Id.*)  She noted that Plaintiff had an alleged onset date of August 19, 2011.  (*Id*.)

On May 24, 2012, Plaintiff presented to  Parkland due to dysuria.  (R. at 865.)  It was noted that she had a history of recurrent urinary tract infection.  (*Id*.)  She was prescribed medication.  (R. at 1049.)

Plaintiff returned on April 27, 2012, complaining of bilateral foot pain that she'd had for several years due to a bunion.  (R. at 1056.)  She was assessed with bilateral hallux valgus.  (R. at 1057.)  Plaintiff decided to continue with tennis shoes and not undergo surgery because she was concerned about having to be off her feet and wearing a cast for two months post-surgery.  (*Id*.)

On October 12, 2012, Plaintiff presented to Hunt Regional Community Hospital complaining of an itchy skin rash.  (R. at 1125, 11128.)  She had a productive cough, nasal congestion, and

11

difficulty breathing.  (R. at 1128.)  A review of symptoms revealed normal lung markings and no respiratory distress.  (R. at 1129.)  She was assessed with scabies.  (R. at 1126.)

On September 30, 2013, Plaintiff presented to Parkland for a medication refill as well as a referral to a liver specialist for cirrhosis.  (R. at 1219.)  She was advised to talk with her primary care physician to discuss referral options.  (R. at 1220.)

Plaintiff was noted as experiencing fatigue during sessions at Metrocare on September 26, 2013, and November 7, 2013.  (R. at 1234, 1238.)

### 3. Hearing Testimony

On January 24, 2013, Plaintiff and a vocational expert (VE) testified at a hearing before the ALJ.  (R. at 32-71.)  Plaintiff was represented by an attorney.  (R. at 32, 34.)

#### a. *Plaintiff's Testimony*

Plaintiff testified that she was born on December 12, 1957, and she was 55 years old at the time of the hearing.  (R. at 36.)  She completed the ninth grade but did not graduate from highschool because she became pregnant and got married.  (R. at 36.)  She never took any college or GED classes, and she did not have any vocational training.  (*Id*.)

In the past fifteen years, Plaintiff had worked six years as a cashier at a thrift store and at Walmart, and as a short order cook for Sonic for seven years.  (R. at 37-38.)  She also worked as part of a remodeling crew for Walmart for about a week and a half and as a cashier for a few months at Tom Thumb before she got sick and lost her job.  (R. at  39.)

After working for Walmart, she received unemployment for two years.  (R. at 40.)  She looked for work "through the Texas Workforce" and put in several applications.  (*Id*.)  The prior week, she had unsuccessfully tried to get a job at Sonic as a cook.  (*Id*.)

She last received private health insurance in March of 2010, when she worked at Walmart. (R. at 41.)  She received some Cobra coverage, but it ran out because she did not have the money to pay for it.  (*Id.*)  Since she lost her insurance, she became dependant on Parkland's healthcare. (*Id.*)

The ALJ clarified that the next questions he would ask were only for the time frame after her alleged onset date of August 19, 2011.  (R. at 42.)  However, in order to ensure that they included all information for the relevant time frame, he told her that they were going to start on August 1, 2011. (*Id.*)

On November 21, 2011, Plaintiff had an entire lobe of her right lung removed due to cancer and remained in the hospital for seven days.  (R. at 42-43.)  She did not have any follow-up therapy or rehabilitation.  (*Id.*)  The doctor wanted to put her on oxygen, but she could not afford it.  (*Id.*)

During much the time of her disability, she was divorced and lived by herself in a one bedroom, first-floor apartment.  (R. at 43.)  She had a 401K from Walmart, but she used it to live off of after she was fired.  (R. at 44-45.)  She had a 2003 Kia and a driver's license.  (R. at 47.)  She needed glasses to drive.  (R. at 48.)  She attended church infrequently.

Plaintiff had two grown children and five grandchildren.  (R. at 45.)  She used to live close to her son in Mesquite, Texas, but she had moved into a trailer home with friends in Commerce, Texas, four months earlier.  (R. at 45-46.)  She slept on the couch in the trailer home, and she kept her belongings in a storage trailer behind the trailer home.  (*Id.*)  She washed the dishes and mopped the floor.  (R. at 49.)  However, she did not do her own cooking, the laundry, vacuum, take out the garbage, or any other household chores.  (R. at 48-49.)

She normally woke up around 10 a.m. and went to sleep at 9 p.m.  (*Id.*)  She watched

television for about six hours a day, and she did not have access to a computer.  (*Id.*)  She did not

do any reading, partake in any social media, or participate in any other recreational activities.  (R.

at 50-51.)  She did not do any kind of volunteer work.  (R. at 52.)  She did not have a bank account,

and the only credit card she had was a Lonestar card.  (R. at 51.)

She believed the reason she had not gotten hired when trying to find a job after she was fired

from Walmart was because of her cancer.  (R. at 52.)

Plaintiff was not undergoing any treatment for her lung, but she went to the emergency room

three months prior to the hearing due to bronchitis.  (R. at 53.)  She had not smoked consistently in

four months; she had one cigarette about two weeks before the hearing.  (*Id.*)  She used an inhaler

about twice a month.  (R. at 55.)  She did not think she was capable of working because she had

trouble breathing.  (R. at 55.)  She lived with people who smoked. (R. at 56.)

Upon examination by her attorney, she testified that besides lung cancer, she suffered from

other illnesses that affected her ability to work such as hepatitis C, cirrhosis, high blood pressure,

and irreversible hearing damage.  (*Id.*)  She went to Metrocare for anxiety, mood swings, panic

attacks, and depression.  (R. at 57.)

She could typically be on her feet for about one hour at a time before she needed to stop and

take a break because she got short of breath.  (R. at 57.)  She could probably stay on her feet for two

to three hours within an eight-hour work day.  (*Id.*)

If she could live alone, she would not live with smokers because smoking caused cancer.

(R. at 57.)   However, she had no option but to live with smokers at that time because she had no

income, and the smokers were helping her out.  (*Id.*)

The heaviest amount of weight she thought she could lift and carry a short distance was five

pounds due to her trouble breathing.  (R. at 58.)

Her hepatitis C caused a lot of pain in her right side as well as nausea.  (*Id*.)  She rated her pain at about a five out of ten on a scale of zero to ten.  (*Id*.)  She could not go back on chemotherapy for her hepatitis C because it ate the chemicals in her brain.  (R. at 59.)

She had problems hearing and speaking correctly at times due to nerve damage in her ear caused by a car wreck.  (R. at 58.)

Her energy level was low because she stayed sick all the time.  (R. at 59.)  She had really bad days with her breathing about four times a week, but she was not able to get more treatment for her breathing because she did not have the money.  (R. at 59.)

She asked, but did not apply, for indigent healthcare in the county she lived in, and she was told she could not get it.  (R. at 60.)

Her mental illness caused anxiety attacks, panic attacks, and a lack of focus.  (R. at 60.)  Her last panic attack was the morning of the hearing.  (*Id*.)  During her panic attacks, she got dizzy, her heart would beat real fast, and she would get sweaty.  (R. at 61.)  She was real nervous around people, and she felt that they were staring at her sometimes.  (*Id*.)  Her appetite was poor.  (*Id*.)  She lived with her ex-husband and his wife, and the only people that she talked to on the phone and visited with were her mother and father.  (*Id*.)

Her ex-husband did the grocery shopping, and she bathed about twice a week because she sometimes did not feel like doing it.  (R. at 61-62.)

### b.     VE's Testimony

The VE classified Plaintiff's past relevant work as a cashier/salesclerk, both for a thrift store

15

and other retail locations (semi-skilled, SVP:3, light, DOT[6] 290.477-014); cashier (semi-skilled, SVP:3, light, DOT 211.462-014); and a fast food worker (unskilled, SVP:2, light, DOT 311.472-010).  (R. at 62-63.)  He testified that there were some sedentary cashier positions at the semi-skilled level that would be available if Plaintiff could perform sedentary work.  (R. at 63.)  The way the record indicated that Plaintiff performed her past work was consistent with how the work was described in the DOT.  (*Id.*)

The ALJ asked the VE to opine whether a hypothetical person of the same age, education, and work history could perform Plaintiff's past relevant work if she had no exertional limitations; could sit, stand and/or walk for six hours in an eight-hour work day, had no push or pull limitations with her upper or lower extremities; had no manipulative, postural, communicative, environmental, or visual limitations; that from a mental standpoint was capable of learning, understanding, remembering, carrying out at least simple decisions, instructions, and tasks; could use judgment and make work-related decisions; could respond and relate appropriately to supervisors and co-workers; could maintain attention and concentration for at least two-hour intervals; and could adapt to and deal with changes in work settings and environments.  (R. at 63-64.)

According to the VE, those limitations did not preclude Plaintiff's past relevant work as a fast food worker because it was an unskilled job and consistent with simple, repetitive, one or two-step tasks.  (R. at 64.)  However, those limitations would preclude the cashier jobs because they require the ability to follow detailed instructions.  (*Id.*)

After the ALJ modified the hypothetical to include additional limitations of no exposure to respiratory environmental irritants such as smoke, dust, odors, etc., the VE testified that the fast food

---

[6]The DOT means the Dictionary of Occupational Titles.

worker position would be precluded. (*Id.*)

When asked if there were other jobs that existed in significant numbers in the national economy that such a hypothetical individual could do, the VE testified that up until age 55, such an individual could do the job of a packer, which was a two-step packaging job (unskilled, light, SVP:2, DOT 529.687-186).  (R. at 65.)  There were 80,000 jobs in the Texas economy and 800,000 jobs nationally.  (*Id.*)  He also testified that such an individual could do the job of an assembler (unskilled, light, SVP:2, DOT 700.684-070) with 52,000 jobs in the Texas economy and 520,000 jobs nationally.  (*Id.*)  A third job was a hardware assembler (unskilled, light, SVP:2, DOT 701.687-010) with 18,000 jobs in the Texas economy and 180,000 nationally.  (*Id.*)  Those jobs were performed in an indoor environment with constant temperature control and no exposure to airborne pollutants.  (*Id.*)

Upon examination by Plaintiff's attorney, the VE testified that a hypothetical person who was limited to sedentary, simple work would not be able to perform Plaintiff's past relevant work or the  work in the national economy that the VE identified.  (R. at 66.)  His reasoning was that Plaintiff was 53 years old at onset, and according to the ALJ's hypothetical, she was limited to simple, repetitive tasks, which were designated as unskilled in the DOT.  (*Id.*)  Therefore, all her past work was at the light level and would be precluded if she was limited to sedentary.  (*Id.*)

The VE also testified that taking the ALJ's first and second hypotheticals and limiting the hypothetical person to only occasional public interaction, all of Plaintiff's past work would be precluded because those jobs involve dealing with the public on an ongoing basis.  (*Id.*)  However, the packaging and assembler jobs would not be precluded because they did not deal with the public.  (*Id.*)

17

The tolerance for being off task for Plaintiff's past work and the assembler and packaging jobs was zero.  (R. at 67-68.)  The tolerance for missed work for those jobs would be a maximum of two days a month, and if someone began to exceed that with any regularity, it would lead to termination.  (R. at 68.)

Additionally, the VE testified that if someone was operating at a reduced pace of about fifteen to seventeen percent, they would not be able to perform any of the past relevant work or the assembler and packaging jobs the VE mentioned.  (*Id*.)  He also testified that an individual with limited hearing would be precluded from the cashier and fast food worker jobs, but limited hearing would not impact being a packer or assembler.  (*Id*.)  Finally, the VE testified that all the jobs mentioned and identified required gross manipulation.  (R. at 69-70.)

Before the hearing concluded, Plaintiff's attorney mentioned to the ALJ that no physical consultative examination had been done, which was a concern based on Plaintiff's complaints at the hearing.  (R. at 70.)  He also stated that no spirometry test had been done.  (*Id*.)

The ALJ stated that if he thought additional information was needed, he would request it. (*Id*.)

## C.  The ALJ's Findings

The ALJ issued his decision denying benefits on August 30, 2013.  (R. at 27.)  At step one,[7] he found that Plaintiff had not engaged in substantial gainful activity since August 19, 2011, the alleged onset date.  (R. at 19.)  At step two, he found that Plaintiff had three severe impairments: status post lung cancer; cognitive disorder, not otherwise specified; and affective disorder.  (R. at 15.)  Despite those impairments, at step three, he found that Plaintiff had no impairment or

---

[7]The references to steps one to four refer to the five-step analysis used to determine whether a claimant is disabled under the Social Security Act, which is described more specifically below.

combination of impairments that met or equaled the severity of one of the impairments listed in the social security regulations. (R. at 16.) Next, the ALJ determined that Plaintiff had the Residual Functional Capacity (RFC) to perform a full range of work at all exertional levels as defined by the social security regulations. (R. at 23.) He found that she could sit, stand, and/or walk for about six hours in an eight-hour workday; she was not limited in pushing and/or pulling (including the operation of hand and/or foot controls) with her upper or lower extremities; she had no postural, manipulative, visual, environmental, or communicative limitations; mentally, she retained the ability to learn, understand, remember, and carry out at least simple work instructions and tasks; and in such a work setting, could use judgment in making simple work-related decisions, respond and relate appropriately to others, such as supervisors and coworkers, maintain attention and concentration for at least two-hour intervals, and adapt to and deal with simple changes in work settings and environments. (R. at 18.) At step four, he found that based on the VE's testimony, Plaintiff was able to perform past relevant work as a fast food worker because it did not require the performance of work-related activities precluded by Plaintiff's RFC. (R. at 25.) Accordingly, the ALJ determined that Plaintiff had not been under a disability, as defined by the Social Security Act, before or after August 19, 2011, through the date of his decision. (*Id.*)

## II.   ANALYSIS

### A.   <u>Legal Standards</u>

#### 1.   **Standard of Review**

Judicial review of the Commissioner's denial of benefits is limited to whether the Commissioner's position is supported by substantial evidence and whether the Commissioner applied proper legal standards in evaluating the evidence. *Greenspan v. Shalala*, 38 F.3d 232, 236

(5th Cir. 1994); 42 U.S.C. § 405(g). "Substantial evidence is that which is relevant and sufficient for a reasonable mind to accept as adequate to support a conclusion; it must be more than a scintilla, but it need not be a preponderance." *Leggett v. Chater*, 67 F.3d 558, 564 (5th Cir. 1995) (quoting *Anthony v. Sullivan*, 954 F.2d 289, 295 (5th Cir. 1992)). In applying the substantial evidence standard, the reviewing court does not reweigh the evidence, retry the issues, or substitute its own judgment, but rather, scrutinizes the record to determine whether substantial evidence is present. *Greenspan*, 38 F.3d at 236. A finding of no substantial evidence is appropriate only if there is a conspicuous absence of credible evidentiary choices or contrary medical findings to support the Commissioner's decision. *Johnson v. Bowen*, 864 F.2d 340, 343-44 (5th Cir. 1988).

The scope of judicial review of a decision under the supplemental security income program is identical to that of a decision under the social security disability program. *Davis v. Heckler*, 759 F.2d 432, 435 n. 1 (5th Cir. 1985). Moreover, the relevant law and regulations governing the determination of disability under a claim for disability insurance benefits are identical to those governing the determination under a claim for supplemental security income. *See id*. Thus, the Court may rely on decisions in both areas without distinction in reviewing an ALJ's decision. *See id*. at 436 and n.1.

### 2.     Disability Determination

To be entitled to social security benefits, a claimant must prove that he or she is disabled as defined by the Social Security Act. *Leggett*, 67 F.3d at 563-64. The definition of disability under the Social Security Act is "the inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 42

U.S.C. § 423(d)(1)(A).  When a claimant's insured status has expired, the claimant "must not only

prove" disability, but that the disability existed "prior to the expiration of [his or] her insured status."

*Anthony*, 954 F.2d at 295.  An "impairment which had its onset or became disabling after the special

earnings test was last met cannot serve as the basis for a finding of disability."  *Owens v. Heckler*,

770 F.2d 1276, 1280 (5th Cir. 1985).

The Commissioner utilizes a sequential five-step analysis to determine whether a claimant

is disabled:

1.  An individual who is working and engaging in substantial gainful activity will not
    be found disabled regardless of medical findings.

2.  An individual who does not have a "severe impairment" will not be found to be
    disabled.

3.  An individual who "meets or equals a listed impairment in Appendix 1" of the
    regulations will be considered disabled without consideration of vocational factors.

4.  If an individual is capable of performing the work he has done in the past, a finding
    of "not disabled" must be made.

5.  If an individual's impairment precludes him from performing his past work, other
    factors including age, education, past work experience, and residual functional
    capacity must be considered to determine if work can be performed.

*Wren v. Sullivan*, 925 F.2d 123, 125 (5th Cir. 1991) (summarizing 20 C.F.R. § 404.1520(b)-(f)

(currently 20 C.F.R. § 404.1520(a)(4)(I)-(v) (2012)).  Under the first four steps of the analysis, the

burden lies with the claimant to prove disability.  *Leggett*, 67 F.3d at 564.  The analysis terminates

if the Commissioner determines at any point during the first four steps that the claimant is disabled

or is not disabled.  *Id*.  Once the claimant satisfies his or her burden under the first four steps, the

burden shifts to the Commissioner at step five to show that there is other gainful employment

available in the national economy that the claimant is capable of performing.  *Greenspan*, 38 F.3d

at 236.  This burden may be satisfied either by reference to the Medical-Vocational Guidelines of the regulations or by expert vocational testimony or other similar evidence.  *Fraga v. Bowen*, 810 F.2d 1296, 1304 (5th Cir. 1987).  After the Commissioner fulfills this burden, the burden shifts back to the claimant to show that he cannot perform the alternate work.  *Perez v. Barnhart*, 415 F.3d 457, 461 (5th Cir. 2005).  "A finding that a claimant is disabled or is not disabled at any point in the five-step review is conclusive and terminates the analysis." *Loveland v. Bowen*, 813 F.2d 55, 58 (5th Cir. 1987).

**B.**    **Issues for Review**

Plaintiff presents three issues for review:

> (1) The ALJ must address every medical opinion in the record, even when that opinion embraces an issue reserved to the Commissioner.  Did the ALJ commit reversible error by failing to discuss the opinions by treating physician Andrew David Merkin, M.D., when those opinions pre-dated Davidson's alleged onset of disability but nevertheless predicted periodic work absences?

> (2) The Fifth Circuit Court of Appeals held in *Stone v. Heckler* that an impairment is nonsevere only if it would not be expected to interfere with the individual's ability to work.  Did the ALJ commit harmful error by not recognizing hepatitis C and osteoarthritis as severe impairments, when he reasoned that these did not cause more than a minimal effect on Davidson's ability to do work?

> (3) The RFC must include limitations associated with all impairments the ALJ recognizes.  Did the ALJ reversibly err by not including any environmental limitations in Davidson's RFC despite admitting that her pulmonary impairment was severe and significantly affected her ability to work?

(doc. 16 at 5.)

**C.**    **Medical Opinion Evidence**

Plaintiff first argues that the Commissioner overlooked the opinions from a treating source indicating she cannot work on a regular, continuing basis due to work absences associated with hepatitis C.  (doc. 16 at 15.)  She argues that the ALJ failed to address any of Dr. Merkin's opinions

despite his "overly broad boilerplate claim to have considered all opinion evidence." (*Id.* at 17.) The Commissioner responds that the ALJ did review the record as a whole, including Plaintiff's treating physician's opinion, and that he was not required to address Dr. Merkin's 2009 and 2010 opinions because they predated her alleged onset date.[8] (doc. 17 at 9.)

Here, the ALJ's decision stated that he has "reviewed, considered, evaluated, analyzed, and weighed all opinion evidence, conflicting or otherwise, and regardless of its nature and source (consultative, treating, or State medical experts), in accordance with the requirements of 20 CFR 404.1527, 416.927, and SSRs 96-2p, 96-5p, and 96-6p." (doc. 12-3 at 24.)  It then stated, "[s]ee previous discussions of all the various contrary, contradictory, or similar opinions/conclusions of claimant's physical and mental impairments by source and exhibits cited heretofore." (*Id*. at 24-25.) It also asserted that "[a]ll opinions/conclusions were accorded the weight merited by the overall evidence from each source, in conjunction with the total evidence in the case and other relevant factors as provided in the regulations." (*Id*. at 24.)

### 1.    *Opinions Prior to Onset Date*

According to the social security regulations, an ALJ is required to consider *all medical opinions* in the record, regardless of their source. *See* 20 C.F.R. § 404.1527(c)(2). The regulations do not provide any exception to that requirement for opinions that pre-date a claimant's onset date. *See id.*  The Fifth Circuit has not specifically addressed whether ALJs are required to consider

---

[8]The Commissioner argues that Plaintiff's relies on Dr. Merkin's 2009 and 2010 opinions as determinative that she was disabled during the relevant time period, but she was found not disabled under a prior disability application after those opinions, and the ALJ found no reason to reopen the prior application.  (doc. 17 at 9.) Plaintiff does not argue that those opinions are determinative of her disability, but only that the ALJ erred in not considering them.  "It is well-established that evidence from a prior application, even if not re-opened, can be relevant to a claim of disability with a later onset date."  *Beth v. Astrue*, 494 F. Supp.2d 979, 1006 (E. D. Wis. 2007).

opinions medical opinions that predate the alleged onset of disability.  Other circuits, however, have found that an ALJ may not simply ignore medical opinions because they pre-date the onset of disability or post-date the last insured date, since that evidence can be relevant to a claim of disability.  *See Carpenter v. Astrue*, 537 F.3d 1264, 1266 (10th Cir.2008) (finding that the ALJ erred by failing to acknowledge any of the medical evidence before the year that the claimant's disability allegedly began because the regulations required him to consider all of the evidence in the record when determining whether the claimant was disabled), citing 20 C.F.R. §§ 404.1520(a)(3), 416.920(a)(3)[9]; *DeBoard v. Commissioner of Social Security*, 211 F. App'x 411, 414 (6th Cir.2006) ("We do not endorse the position that all evidence or medical records predating the alleged date of the onset of disability ... are necessarily irrelevant.... We recognize that evidence ... predating the onset of disability, when evaluated *in combination with later evidence*, may help establish disability."); *Burks–Marshall v. Shalala*, 7 F.3d 1346, 1348 n. 6 (8th Cir.1993) ( "Evidence from the record of a prior claim may be relevant to a claim of disability with a later onset date."); *Frustaglia v. Sec'y of Health & Human Servs.*, 829 F.2d 192, 193 (1st Cir.1987) (noting that "the ALJ is entitled to consider evidence from a prior denial for the limited purpose of reviewing the preliminary facts or cumulative medical history necessary to determine whether the claimant was disabled at the time of his second application"); *Halvorsen v. Heckler*, 743 F.2d 1221, 1225–26 (7th Cir.1984) (finding "no doubt that medical evidence from a time subsequent to a certain period is relevant to a determination of a claimant's condition during that period" and that the ALJ's "little, if any, consideration" of medical records post-dating the claimant's date last insured mandated

---

[9] *See also Hamlin v. Barnhart*, 365 F.3d 1208, 1215 (10th Cir.2004) ("even if a doctor's medical observations regarding a claimant's allegations of disability date from earlier, previously adjudicated periods, the doctor's observations are nevertheless relevant to the claimant's medical history and should be considered by the ALJ"), citing *Groves v. Apfel*, 148 F.3d 809, 810–11 (7th Cir.1998).

reversal).[10]  Given the language of § 404.1527(c)(2), and considering the number of circuits that have so found, this Court agrees that medical opinions may not be ignored just because they predate the disability onset date.

Here, although the ALJ stated that he considered all the opinion evidence, he never mentioned Dr. Merkin or any of his opinions.  It therefore appears that the ALJ ignored or failed to consider Dr. Merkin's opinions at all.  By so doing, he committed error.

### 2.    *Treating Source Statements*

Even if the Court were to find that the ALJ's general statements that he reviewed the record as whole sufficiently demonstrate that he did consider Dr. Merkin's opinions, as the Commissioner contends, the ALJ still erred because he was required to articulate good cause for assigning little or no weight to a treating source.

The Commissioner is entrusted to make determinations regarding disability, including evaluating medical opinions and weighing inconsistent evidence.  20 C.F.R. §§ 404.1520b(b) and 404.1527(c) (2012).  Every medical opinion is evaluated regardless of its source, but the Commissioner generally gives greater weight to opinions from a treating source.  20 C.F.R. § 404.1527(c)(2).  A treating source is a claimant's "physician, psychologist, or other acceptable medical source" who provides or has provided a claimant with medical treatment or evaluation, and who has or has had an ongoing treatment relationship with the claimant.  *Id.* § 404.1502.  When "a treating source's opinion on the issue(s) of the nature and severity of [a claimant's] impairment(s) is well-supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with the other substantial evidence," the Commissioner must give such an opinion

---

[10]*See also Boone v. Colvin*, No. 3:14-cv-1881, 2015 WL 3999336, at *6 (N.D.Tex.  July 1, 2015)(finding the ALJ erred in rejecting a medical opinion dated almost five years prior to the claimant's onset date)

controlling weight. *Id.* § 404.1527(c)(2).

If controlling weight is not given to a treating source's opinion, the Commissioner considers six factors in deciding the weight given to each medical opinion: (1) whether the source examined the claimant or not; (2) whether the source treated the claimant; (3) the medical signs and laboratory findings that support the given opinion; (4) the consistency of the opinion with the record as a whole; (5) whether the opinion is made by a specialist or non-specialist; and (6) any other factor which "tend[s] to support or contradict the opinion." *See id.* § 404.1527(c)(1)–(6). The "standard of deference to the examining physician is contingent upon the physician's ordinarily greater familiarity with the claimant's injuries. [W]here the examining physician is not the claimant's treating physician and where the physician examined the claimant only once, the level of deference afforded his opinion may fall correspondingly." *Rodriguez v. Shalala*, 35 F.3d 560, at *2 (5th Cir. 1994) (unpublished) (citing *Moore v. Sullivan*, 919 F.2d 901, 905 (5th Cir. 1990)). A treating physician's opinion may also be given little or no weight when good cause exists, such as "where the treating physician's evidence is conclusory, is unsupported by medically acceptable clinical, laboratory, or diagnostic techniques, or is otherwise unsupported by the evidence." *Newton v. Apfel*, 209 F.3d 448, 456 (5th Cir. 2000). If the evidence supports a contrary conclusion, an opinion of any physician may be rejected. *Id.* at 455; *Bradley v. Bowen*, 809 F.2d 1054, 1057 (5th Cir. 1981) (per curiam).

A factor-by-factor analysis is unnecessary when "there is competing first-hand medical evidence and the ALJ finds as a factual matter that one doctor's opinion is more well-founded than another," or when the ALJ has weighed "the treating physician's opinion on disability against the medical opinion of other physicians who have treated or examined the claimant and have specific

26

medical bases for a contrary opinion." *Id.* at 458.  "[A]bsent reliable medical evidence from a treating or examining physician *controverting the claimant's treating specialist*, an ALJ may reject the opinion of the treating physician only if the ALJ performs a detailed analysis of the treating physician's views under the criteria set forth in [20 C.F.R. § 404.1527(c)]." *Id.* at 453 (emphasis added).

While an ALJ should afford considerable weight to opinions and diagnoses of treating physicians when determining disability, sole responsibility for this determination rests with the ALJ. *Newton*, 209 F.3d at 455.  The ALJ's RFC decision can be supported by substantial evidence even if he does not specifically discuss all the evidence that supports his decision, or all the evidence that he rejected. *Falco v. Shalala*, 27 F.3d 160, 164 (5th Cir. 1994).  A reviewing court must defer to the ALJ's decision when substantial evidence supports it, even if the court would reach a different conclusion based on the evidence in the record. *Leggett*, 67 F.3d at 564.  Nevertheless, the substantial evidence review is not an uncritical "rubber stamp" and requires "more than a search for evidence supporting the [Commissioner's] findings." *Martin v. Heckler*, 748 F.2d 1027, 1031 (5th Cir. 1984) (citations omitted).  The court "must scrutinize the record and take into account whatever fairly detracts from the substantiality of the evidence supporting the [ALJ's] findings." *Id.* (citations omitted)  Courts may not re-weigh the evidence or substitute their judgment for that of the Commissioner, however, and a "no substantial evidence" finding is appropriate only if there is a conspicuous absence of credible evidentiary choices or contrary medical findings to support the ALJ's decision. *See Johnson*, 864 F.2d at 343 (citations omitted).

Dr. Merkin, as a physician who had an ongoing relationship with Plaintiff and rendered medical treatment and evaluation, was a treating physician under the regulations. *See* 20 C.F.R. §

404.1502. Because there were no other treating or examining sources controverting his opinions, the ALJ was required to undergo a detailed analysis of the factors set forth in 20 C.F.R. § 404.1527(c)(2). Even if there was medical evidence from a treating or examining source controverting Dr. Merkin's medical opinions and the ALJ was not required to undergo a detailed analysis of the (c)(2) factors, he was still required to explain his reasons for affording little or no weight to Dr. Merkin's opinions. *See Gomez v. Barnhart,* No. SA-03-CA-1285-XR, 2004 WL 2512801, at *2 (W.D.Tex. Nov. 5, 2004)("[A]n ALJ who rejects the opinion of a treating physician must explain his reasons for doing so."). Because he failed to do so, the ALJ committed legal error.

### 3.    Harmless Error

Plaintiff argues that the ALJ's error was not harmless because Dr. Merkin's limitations, if adopted, would have resulted in workplace absences, which the VE testified would lead to termination. (doc. 16 at 19.) She contends that it was therefore not inconceivable that the ALJ would have reached a different conclusion had he considered Dr. Merkin's opinions. (*Id.*) In the Fifth Circuit, harmless error exists when it is inconceivable that a different administrative conclusion would have been reached absent the error. *Bornette v. Barnhart*, 466 F.Supp.2d 811 (E.D.Tex. 2006) (citing *Frank v. Barnhart*, 326 F.3d 618, 622 (5th Cir. 2003)).

As noted above, Dr. Merkin opined that Plaintiff's physical conditions would cause periodic absences from work, were very unpredictable, and would require close and frequent treatment by a physician. (R. at 276-77, 279-80.) It is not inconceivable that he would have reached a different conclusion had he considered these opinions.[11] Even though they were made prior to Plaintiff's

---

[11]To the extent he had considered them, the ALJ was entitled to reject Dr. Merkin's opinions regarding Plaintiff's inability to work because disability determinations are reserved for the Commissioner. *Frank v. Barnhart*, 326 F.3d 618, 620 (5th Cir. 2003).

alleged onset date, Dr. Merkin's opinions were the only opinions regarding Plaintiff's limitations from a treating or examining source. The SAMC opinions, to which the ALJ apparently assigned great weight, did not appear to take into account Dr. Merkin's opinions. Moreover, the record reflects that after the time of Dr. Merkin's opinions, Plaintiff often complained of fatigue, joint pain and nausea and vomiting,[12] which support some limitations due to hepatitis C and/or cirrhosis, and she requested a referral to a liver clinic. (*See* 451-52, 551-52, 624, 627, 799, 1234, 1238.) Had the ALJ considered Dr. Merkin's opinions, he could have found additional limitations regarding Plaintiff missing work during episodic flare-ups that would affect her RFC and possibly his ultimate finding. The VE testified that the tolerance for missed work for all the jobs he identified, both Plaintiff's past relevant work and the assembler and packaging jobs, would be a maximum of two days a month. Therefore, consideration of Dr. Merkin's opinion could have resulted in a finding that Plaintiff was precluded from all the jobs identified by the VE, including her past relevant work.

Accordingly, the ALJ's error was not harmless because it is not inconceivable that he would have reached a different decision had he considered Dr. Merkin's opinions. *See McAnear v. Colvin*, No. 3:13-cv-4985, 2015 WL 1378728, at *5 (N.D.Tex. Mar. 26, 2015)(finding remand was required because there was a realistic possibility of a different conclusion by the ALJ where the court was unsure of whether the ALJ considered the medical source's opinion and whether such a review would have changed the outcome of his decision); *Paul v. Colvin*, No. 3:12-cv-00130, 2013 WL 1294666, at *24 (N.D.Tex. Mar. 14, 2013)(finding the ALJ's error in failing to present good cause for rejecting a treating source's opinion was not harmless where it was not inconceivable that the ALJ would have reached a different conclusion had he considered the opinion); *Singleton v. Astrue*,

---

[12]The ALJ incorrectly stated in his finding that there was no evidence in the record of nausea and vomiting. (*See* R. at 21.)

No. 3:11-cv-2332, 2013 WL 460066, at *6 (N.D.Tex. Feb. 7, 2013)(finding the ALJ's error in not considering the medical source opinion was not harmless and reversal and remand were required because the court could not say what the ALJ would have done had he considered the opinion, and had he considered the opinion he might have reached a different decision).[13]

### III.   CONCLUSION

The Commissioner's decision is **REVERSED**, and the case is **REMANDED** to the Commissioner for further proceedings.

**SO ORDERED on this 30th day of September, 2015.**

IRMA CARRILLO RAMIREZ
UNITED STATES MAGISTRATE JUDGE

---

[13]Because this error requires remand and the ALJ's consideration of Dr. Merkin's opinion may affect the remaining issues, it is unnecessary to reach those issues.